MRS. A. J., on behalf of herself and her daughter, K. J., Plaintiff,

v.

SPECIAL SCHOOL DISTRICT NO. 1, Defendant.

Civ. No. 4–77–192.

United States District Court, D. Minnesota, Fourth Division.

Oct. 12, 1979.

William F. Messinger, Minneapolis, Minn., James E. Wilkinson, III, Coalition for the Protection of Youth Rights, Central Minnesota Legal Services, Minneapolis, Minn., for plaintiff.

Frederick E. Finch, Fredrikson, Byron, Colborn, Bisbee & Hansen, P.A., Minneapolis, Minn., for defendant.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This is an action brought pursuant to 42 U.S.C. § 1983[1] by Mrs. A. J. on behalf of herself and her daughter K. J.[2] which challenges the lawfulness of the procedures utilized by Special School District No. 1, the Minneapolis Public Schools, in ordering that K. J. be suspended from school for 15 days for disciplinary reasons. The jurisdiction of this Court is predicated on 28 U.S.C. § 1343(3). Plaintiff has also asserted a pendent state law claim which challenges the defendant's compliance with the Pupil Fair Dismissal Act, Minn.St. §§ 127.26–127.-39. Further, plaintiff alleges that defendant has not complied with federal or state statutes and regulations concerning handicapped students. Plaintiff seeks declaratory and other equitable relief, as well as attorneys' fees pursuant to 42 U.S.C. § 1988. The Court, having considered all of the evidence presented at trial, as well as the stipulation of facts entered into by the parties, hereby makes the following find-

1. 42 U.S.C. § 1983 provides:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

2. Pursuant to an agreement of counsel, Mrs. A. J. and K. J. have proceeded throughout this litigation without using their names, in order to avoid any possible stigma which could result from public disclosure of their identities.

ings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

On May 16, 1977, K. J., at the time an eighth grade student at Anwatin Middle School, a part of defendant's school system, was suspended for a period of 15 school days by assistant principal David King. The present controversy stems from the allegedly unlawful procedures utilized by the Minneapolis school administration in effectuating this suspension. The 15-day suspension resulted from a fight K. J. was involved in with another student on May 16, 1977. After being sent by her art teacher to assistant principal King's office, and after failing to find him in his office, K. J. went to the counseling department area, where she harassed other students and a secretary. Mr. King found K. J. in the counseling area and took her to his office, where he allowed K. J. to explain her version of the facts involving the fight in art class and the incident in the counseling area, as required by *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). There is no dispute as to whether the requirements of *Goss* were followed here. In this informal conference between K. J. and Mr. King, K. J. offered no explanation of her behavior, and did not deny that the incidents in question had transpired. At the conclusion of their conference, Mr. King informed K. J. that she was suspended from school for 15 days.

On May 17th, Mr. King prepared the required "notice of formal suspension," which was delivered to Mrs. A. J. on the same day along with a document entitled "alternative education program." The "notice of formal suspension" served on Mrs. A. J. included a statement of the facts underlying the suspension, the grounds for the suspension, a description of testimony, and a readmission plan. The readmission plan, which is mandated by Minn.St. § 127.27, subd. 10, provided that "[h]omework to be supplied and request for demissions from school for the remainder of the 1976/77 school year with referral to SERCC for placement at Bryant YES Center school year 1977/78." The term "demission" relates to the removal of a student, either from the school building,

the school system, or a school program. SERCC, the "Special Education Referral Coordinating Committee" is a committee of the Minneapolis school system which examines the educational programs or placements of students referred to the committee, and determines whether the student needs special education services. The Bryant YES Center is a Level V special education program which is operated by the Minneapolis Public Schools. *See* 5 MCAR EDU 120B.11. The form served on Mrs. A. J. which was entitled "alternative education program" provided that "[w]hile K. J., is suspended from school the following alternative education will be provided to him/her: [h]omework to be supplied . . . . ."

Prior to K. J.'s May 16th suspension, her behavior had led to other disciplinary measures being taken against her. On February 25, 1977, K. J. was sent home for a day for disciplinary reasons. On May 2, 1977, approximately two weeks before the 15-day suspension in issue here, K. J. was suspended for a five-day period for fighting with another student. During the 1976–77 school year, K. J. was not receiving special education services. As a result of these behavior problems and K. J.'s academic performance, a conference was held on May 10, 1977, at the Anwatin School with respect to K. J.'s school problems. Assistant principal King, Ms. Janet Anderson (the Anwatin social worker), Mr. Grommesh (a counselor at Anwatin), Mrs. A. J., and Ms. Clark (a companion of Mrs. A. J.) were present at the May 10th meeting. At this meeting, Mrs. A. J. signed a parental consent form which authorized an evaluation of K. J. to determine if she was in need of special education services. On May 20th, Mrs. A. J. signed another parental consent form authorizing a psychological evaluation of K. J. A diagnostic prescriptive specialist for the Minneapolis schools tested K. J.'s academic progress during May of 1977 and a report was submitted by this specialist on June 2, 1977. Also, on May 26, 1977, K. J. was given a psychological evaluation by the

school psychologist. The findings of the psychologist were summarized in a report dated June 16, 1977. Thus, at the time K. J. was suspended for 15 days on May 16th, she was the subject of an ongoing "formal educational assessment" as that term is described in Minn.St. § 120.17 and 5 MCAR EDU 120B.12 and EDU 124.[3] As of May 16th, K. J. was not being treated as a special education student or handicapped child by the defendant school system, and the ongoing assessment process had not yet culminated in any identification of K. J. as a handicapped child or any proposed course of action as to K. J.'s future educational placement.

K. J. returned to Anwatin School on June 8, 1977, after being out of school for 15 school days. During the 15-day suspension period, K. J. was given homework from her regular classroom teachers, which was delivered to K. J.'s home by the school social worker. The homework was picked up by the school social worker towards the end of the suspension period, and returned to K. J.'s teachers for grading. No other instructional services were provided to K. J. during the suspension period, and thus homework amounted to the entire "alternative program" designed for K. J. pursuant to Minn.St. § 127.27, subd. 10 and the applicable state regulations and school board policies. Apparently as a result of administrative oversight, the referral to SERCC made by assistant principal King in K. J.'s readmission plan was never consummated, and K. J. remained at Anwatin for the remainder of the 1976–77 school year.[4]

Plaintiff's challenges to the May 16th suspension of K. J. involve constitutional, as well as federal and state law arguments. With respect to the plaintiff's state law claims, she argues that the defendant's interpretation of the Pupil Fair Dismissal Act, Minn.St. § 127.26–127.39, is erroneous. In this regard, plaintiff challenges the school system's practice, as in this case, of providing homework as the sole "alternative program" to students suspended for more than five days. Furthermore, plaintiff contends that a formal hearing is necessary under the Pupil Fair Dismissal Act in the event a student is suspended for more than five days, and that the school's practice of initially imposing three consecutive five day suspensions, for a total of 15 days, misconstrues Minn.St. § 127.27, subd. 10. Plaintiff also argues that school officials, at the time of her May 16th suspension, perceived K. J. as a handicapped student, and therefore a more formal hearing than the informal administrative conference provided was warranted because of K. J.'s handicapped status. Finally, plaintiff submits that the procedures utilized by the defendant in suspending K. J. for 15 days were so deficient as to deprive her of procedural due process under the Fourteenth Amendment. In this connection, plaintiff points out that the informal hearing mandated by *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) is applicable only to suspensions of ten days or less, and as the suspension involved here exceeded ten days, more formal hearing procedures should have been implemented.

## I. THE MINNESOTA PUPIL FAIR DISMISSAL ACT

 The Pupil Fair Dismissal Act, Minn.St. §§ 127.26 to 127.39, was enacted in 1974. This act prescribes elaborate formal hearing procedures to be utilized in the event the school administration attempts to

---

**3.** A "formal educational assessment" is defined in the Minnesota regulations as "an individual evaluation, conducted in accordance with recognized professional standards and the provisions of EDU 124, of a person's performance and/or development for the purpose of determining the need for initiation or change in his or her educational program including special education services." 5 MCAR EDU 120B.12.

**4.** Despite Mr. King's recommendation that the prospect of special education services be provided to K. J. at the Bryant YES Center, the referral was never accomplished. Indeed, K. J. remained at Anwatin until the fall of 1977, when she was involved in another fight and her placement finally changed, with Mrs. A. J.'s consent, to the Bryant YES Center.

expel or exclude[5] a student, but provides only that an "informal administrative conference" transpire before a pupil is suspended. See Minn.St. §§ 127.31, 127.30, subd. 1. The "informal administrative conference" required by Minn.St. § 127.30, subd. 1 is designed to function as the equivalent of the "informal give and take between student and disciplinarian" required by *Goss*. *Goss v. Lopez*, 419 U.S. 565, 584, 95 S.Ct. 729, 741, 42 L.Ed.2d 725 (1975).

## A. SUSPENSIONS FOR FIFTEEN SCHOOL DAYS

The critical section for purposes of this proceeding is Minn.St. § 127.27, subd. 10, which provides:

"Suspension" means an action taken by the school administration, under rules promulgated by the school board, prohibiting a pupil from attending school for a period of no more than five school days. This definition does not apply to dismissal from school for one school day or less. Each suspension action shall include a readmission plan. The readmission plan shall include, where appropriate, a provision for alternative programs to be implemented upon readmission. Suspension may not be consecutively imposed against the same pupil for the same course of conduct, or incident of misconduct, except where the pupil will create an immediate and substantial danger to persons or property around him. In no event shall suspension exceed 15 school days, provided that an alternative program shall be implemented to the extent that suspension exceeds five days.

[emphasis supplied]. This provision, or the Act, has not been interpreted by the Minnesota Supreme Court.[6] The problem in con-

5. Minn.St. § 127.27, subd. 4 and subd. 5 define exclusion and expulsion respectively, as follows:
 Subd. 4. "Exclusion" means an action taken by the school board to prevent enrollment or reenrollment of a pupil for a period that shall not extend beyond the school year.
 Subd. 5. "Expulsion" means an action taken by a school board to prohibit an enrolled pupil from further attendance for a period that shall not extend beyond the school year.
 As Minn.St. § 127.27, subd. 10 allows consecutive suspensions to be imposed provided that the total time period does not exceed 15 days, by implication, any temporary removal of a student from school which exceeds 15 days in length is by definition an expulsion, which requires the use of the formal hearing procedures embodied in Minn.St. § 127.31.

6. The issue of abstention can be raised by the Court *sua sponte. Bellotti v. Baird*, 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976). The Court has determined that abstention would be improper under the circumstances. The equitable doctrine of abstention was initially developed in *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) wherein the Supreme Court held that it would defer exercising its jurisdiction to decide a case until the state courts determined unresolved issues of state law, the resolution of which might obviate the necessity to decide a federal constitutional question. *Pullman* was concerned with a state regulation which was challenged as racially discriminatory, but the unresolved state law issue concerned the power or jurisdiction of the state agency to enact such a regulation. Thus, if under state law there was no power to enact the regulation, the federal constitutional claim became non-existent. *See, e. g., Elkins v. Moreno*, 435 U.S. 647, 98 S.Ct. 1338, 55 L.Ed.2d 614 (1978); *Boehning v. Indiana State Emp. Ass'n, Inc.*, 423 U.S. 6, 96 S.Ct. 168, 46 L.Ed.2d 148 (1975).

In the instant litigation, plaintiff has claimed that more formal hearing procedures are constitutionally required under the Fourteenth Amendment for disciplinary suspensions of 15 days. The construction of the Pupil Fair Dismissal Act involves three central issues. The first issue is whether the school administration may impose three consecutive suspensions at an initial informal administrative conference. Another issue concerns the question of whether homework is a sufficient alternative program under the Act when students are suspended for more than an initial five-day period. The final issue relates to whether the Pupil Fair Dismissal Act requires a hearing with formal procedures in the event that the suspension period exceeds five school days.

Abstention is not proper where the resolution of the state law issues would not change the nature of the constitutional claim, or obviate the need to determine the constitutional claim. *Zbaraz v. Quern*, 572 F.2d 582 (7th Cir. 1978); Wright, Miller & Cooper, 17 *Federal Practice & Procedure*, § 4242 (1978). The issues with respect to the sufficiency of the alternative program provided K. J., or the power of the school administration to impose a 15-day suspension at an initial informal conference, have no bearing or relation to the constitutional issue of whether more formal hearing procedures are

struing this provision is apparent, as the section purports to allow the suspension period to reach 15 school days while unambiguously defining the term "suspension" as an action by the school administration which excludes a student from school for "no more than five school days." The question presented is under what circumstances can suspensions which run for fifteen days be imposed, and what procedures under the statute are required to effectuate suspensions which exceed the five-day maximum. The Minneapolis Board of Education interprets Minn.St. § 127.27, subd. 10 in its Policy # 5202 as follows:

[t]he suspension period may, however, be extended up to 15 school days if a determination is made the pupil will create an immediate and substantial danger to persons or property around him and if an alternative educational program is implemented after five days of suspension.

The defendant's interpretation of the Pupil Fair Dismissal Act allows school administrators, in the event a pupil is deemed to present an immediate and substantial danger to others or property around him, to initially impose a fifteen-day suspension on the pupil. In other words, the defendant's interpretation allows school administrators to impose three five-day consecutive suspensions solely at the initial administrative

conference with the student, as opposed to imposing three five-day suspensions piecemeal or on separate occasions.

The object in construing a statute is of course to determine the intention of the legislature, and in doing so, the Court must give effect to all the words of the statute. Minn.St. § 645.16. By definition, suspension is limited to a time frame of no more than five school days. Minn.St. § 127.27, subd. 10. However, the legislature has provided in unequivocal terms in the last sentence of Minn.St. § 127.27, subd. 10 that a suspension of up to 15 days is permissible if the pupil presents the requisite danger, and as long as an "alternative program" is provided after the initial five-day suspension period. In the preceding sentence of subdivision 10, the legislature has articulated the context in which suspensions for more than five days are permissible, and this sentence provides that suspensions "may not be consecutively imposed against the same pupil for the same course of conduct, or incident of misconduct, except where the pupil will create an immediate and substantial danger to persons or property around him." *Id.* Thus, by implication, the legislature has determined that five-day suspensions can be "consecutively imposed" if the pupil presents the requisite danger, but the consecutive terms may not exceed a total of 15

required for a 15-day suspension. As these two issues have no relevance to the constitutional questions in issue here, any construction of the Pupil Fair Dismissal Act by a state court as to these state law issues would have no bearing on the necessity to adjudicate the federal constitutional claim. In short, any resolution of these state law issues by a state court would not "materially change the nature of the problem." *Bellotti v. Baird*, 428 U.S. 132, 147, 96 S.Ct. 2857, 2866, 49 L.Ed.2d 844 (1976), *citing Harrison v. NAACP*, 360 U.S. 167, 177, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (1959). In this context, abstention is not proper. *Zbaraz v. Quern*, 572 F.2d 582 (7th Cir. 1978).

The issue raised by plaintiff as to whether the Act itself requires formal hearing procedures after a five-day suspension period, of course, is certainly relevant to the need to determine the constitutional issue of whether formal hearing procedures are required for a 15-day suspension under the Fourteenth Amendment. However, a "mere absence of judicial interpretation does not necessarily render [the] meaning [of

the state law issues] unsettled or uncertain." *B T Investment Mgrs., Inc. v. Lewis*, 559 F.2d 950, 954 (5th Cir. 1977). In the present case, it is absolutely clear that the Pupil Fair Dismissal Act does not afford *suspended* students a formal hearing of any sort. *See* Minn.St. § 127.30, subd. I. As the state law is "plain and unambiguous" in this regard, abstention would not be proper. *MacBride v. Exon*, 558 F.2d 443, 448 (8th Cir. 1977).

As the Court has determined that abstention in this case would be inappropriate, and as the Court unquestionably has jurisdiction to decide the federal claims, it is within the discretion of the Court to decide the state law issues under pendent jurisdiction principles. *Hagans v. Lavine*, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974). It should be noted that the propriety of abstention is theoretically distinct from the well established federal policy of refraining from constitutional adjudication where a non-constitutional pendent claim is dispositive of the case, *infra.*

school days, and in the event the time period involved exceeds five days, an "alternative program" must be provided the student. It is evident that the school administration may permissibly impose three five-day suspensions, for a total of 15 days in length. The issue is therefore reduced to whether the school administration, in imposing consecutive suspensions, can do so at the initial informal administrative conference or whether the school administration must wait until the termination of the original five-day suspension, or the second five-day period, to extend the suspension for another five days.

The Pupil Fair Dismissal Act does not expressly address the issue of whether school administrators can impose consecutive suspensions at the initial administrative conference with the pupil. The Court has determined that the school administration may not lawfully impose three consecutive five-day suspensions solely at the initial informal administrative conference. In the view of the Court, the most reasonable construction of Minn.St. § 127.-27, subd. 10 requires the school administration to afford a pupil a separate informal administrative conference prior to any five-day or other extension of the original suspension period, whenever the total time for which the student is temporarily removed from school exceeds five school days. At this, second or third "informal administrative conference," the pupil and the disciplinarian should discuss the facts and reasons underlying the suspension, whether any mitigating factors or other options exist, and whether the student presents a substantial and immediate danger to persons or property if the pupil were to be readmitted to school after the initial suspension period expires. At the conference, if the discipli-

narian is convinced that the student presents a substantial and immediate danger to persons or property around him, the disciplinarian may extend the initial suspension or impose in effect an additional suspension for a period not to exceed another five days. Under the Court's analysis of the Act, an extension of the initial suspension period is in substance the equivalent of a separate suspension. If, for example, a five-day extension was added to an initial five-day suspension, and the school administration sought to extend the suspension for another five days, under the Court's ruling, the Pupil Fair Dismissal Act would require three informal administrative conferences to be conducted—the first conference prior to the initial suspension or as soon thereafter as practicable, the second conference prior to the first five-day extension, and the third conference prior to the second five-day extension.

Several reasons support the conclusion reached by the Court. First, the legislature unequivocally emphasized that the length of a suspension shall be "no more than five school days." Minn.St. § 127.27, subd. 10. By implication, Minn.St. § 127.27, subd. 10 allows for consecutive suspensions to be imposed provided the total time for which the student is excluded from school does not exceed 15 days, provided an "alternative program" is implemented after the initial five-day period and provided that "the pupil will create an immediate and substantial danger to persons or property around him." While the legislature undeniably sanctioned this practice, it also provided in Minn.St. § 127.30, subd. 1, that "[n]o suspension from school shall be imposed without an informal administrative conference with the pupil . . .."[7] As the

---

7. Minn.St. § 127.30, subd. 1 adds a proviso to its requirement that an informal conference be conducted, when it provides "except where it appears that the pupil will create an immediate and substantial danger to himself or to persons or property around him." A literal reading of this provision would allow school administrators, if they considered a particular student dangerous, to suspend the student without affording the student any hearing whatever.

Such an interpretation is not constitutionally permissible. *Goss v. Lopez*, 419 U.S. 565, 582–83, 95 S.Ct. 729, 740, 42 L.Ed.2d 725 (1975). As the *Goss* Court noted:

it follows that as a general rule notice and hearing should precede removal of the student from school. We agree with the District Court, however, that there are recurring situations in which prior notice and hearing cannot be insisted upon. Students whose pres-

legislature defined suspension in five-day increments, it necessarily follows that a conference must be afforded a pupil, if practicable, prior to the imposition of any suspension or extension of any suspension. Moreover, by requiring the administrator to conduct an informal conference or hearing with the student prior to extending the suspension period, the risk of error will be decreased in the administrator's decision as to whether the student presents a substantial and immediate danger to property or others around him. The risk of error cannot be ignored, particularly where a lengthy deprivation, such as the three-week suspension here, is at stake. Under the Court's interpretation, the risk of error will be minimized to some extent, as the requirement of providing a conference before extending the suspension period should mitigate the potentially unwarranted punitive response of school disciplinarians by providing an opportunity to school officials for greater reflection. Further, the student can provide input at these informal conferences as to his or her ability or willingness to conform his or her behavior to the norms of the school. These benefits certainly outweigh any added administrative burdens which might be placed on school officials by complying with these procedures. As for the student who is a continual menace to the school population, property or teaching body, school officials can of course always use the procedures outlined in Minn.St. § 127.31 to expel[8] the troublesome pupil.

In summary, the Court holds that in the event the school administration attempts to temporarily exclude a student from school for more than a five-day period the school is under an obligation by virtue of the Pupil Fair Dismissal Act to provide the student with a separate informal administrative conference prior to extending or adding another suspension to the initial suspension period. At this conference, the disciplinarian and pupil should discuss the facts and reasons underlying the suspension, whether any mitigating factors or viable options exist, and whether the student presents a substantial and immediate danger to others or school property if the student were to be readmitted to school. Only after the school official provides such an opportunity for input from the student, and only after the school administrator makes an informed judgment that the student presents the requisite danger to the school community if readmitted, can the school official extend the suspension period beyond five school days. The same requirements exist for the second extension of the initial suspension as apply to the first extension of the suspension period. Thus, if the school administration seeks to impose a second extension (for example, an extension which would cause the total period in which the pupil is excluded from school to run between 10 and 15 days) of the suspension period, it must provide the pupil with another informal conference before extending the suspension. The Court stops short, however, of requiring the school officials to

---

ence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process may be immediately removed from school. In such cases, the necessary notice and rudimentary hearing should follow as soon as practicable . . . .

*Id.* Thus, Minn.St. § 127.30, subd. 1, which provides that an informal administrative conference must be afforded a student except where he presents an immediate and substantial danger to himself or persons or property around him, is designed to allow disciplinarians to immediately remove students from school if the circumstances warrant an expedited removal. The provision is simply not intended to allow school officials to ignore the requirement of a hearing or conference, whether it be an

initial administrative conference or the required informal conference before any extension of the original suspension. Therefore, as a general rule, the informal administrative conference should take place prior to the removal of the student from school, and prior to any extension of the original suspension. If the student is demonstrably dangerous to himself, others or school property, so that the temporary presence of the student at the school for an informal administrative conference prior to any extension of the original suspension would present an obvious danger, school officials' can legitimately schedule the informal conference with regard to any extension at a more appropriate time.

8. *See* footnote 5, *supra.*

comply with the notice provisions of Minn.St. § 127.30, subd. 2 [9] each time school officials seek to extend or add an additional suspension to the initial period, as to fulfill such procedures would be duplicative and meaningless. It is sufficient for school officials to provide actual notice, whether oral or written, to the pupil or his or her parent of any subsequent informal conferences to be conducted prior to any extension of or addition to the suspension period. As the May 16th suspension of K. J. for 15 days was accomplished without any sort of hearing or conference before the normal five day suspension period was extended, her suspension was unlawful under the Pupil Fair Dismissal Act.

## B. *HEARING PROCEDURES APPLICABLE TO SUSPENSIONS*

The Court has determined that there was no necessity, under the Pupil Fair Dismissal Act, for the defendant to provide more formal hearing procedures in the suspension of K. J., as plaintiff suggests. Plaintiff contends that the Pupil Fair Dismissal Act requires a formal hearing to the extent "dismissals" or suspensions exceed five school days. Plaintiff supports this argument by relying in part on a publication of the Minnesota Department of Education which interpreted Section 127.27, subd. 10, and consistent with this provision, stated: "[i]n suspensions, the student may be sent home for no longer than a *five school day* period." Update, Special Report: Student Bill of Rights, Vol. 9, Special Edition No. 1, p. 7 (Fall, 1974). The role of this Minnesota Department of Education publication, as the publication expressly notes, is an advisory one. In any event, what the publication states is not incor-

rect—the publication simply omitted any reference to consecutive suspension periods, which, as the Court has interpreted the Act, is clearly permissible under the last two sentences of Minn.St. § 127.27, subd. 10. Plaintiff relies chiefly on language in Minn.St. § 127.31, with respect to the timing of an exclusion or expulsion hearing, to buttress her position that a formal hearing is required for suspensions exceeding five days. The obvious answer to this contention is that Minn.St. § 127.27, subd. 10 allows for consecutive suspension terms to be implemented when a student presents an immediate and substantial danger to persons or property around him, provided the total period for which the student was removed from school does not exceed 15 days. As consecutive suspensions are treated under Minn.St. § 127.27, subd. 10 as suspensions, the plain answer to plaintiff's argument is that the exclusion and expulsion procedures of Minn.St. § 127.31 have no bearing whatever on the 15-day suspension imposed here. For these reasons, plaintiff's arguments must be rejected, as defendant was under no obligation by virtue of the Pupil Fair Dismissal Act to provide a hearing with more formal procedures in the suspension of K. J.

## C. *ALTERNATIVE PROGRAMS*

The final issue presented with respect to the Pupil Fair Dismissal Act is whether the supervised homework provided to K. J. after the initial five-day suspension period satisfied the requirement of Minn.St. § 127.27, subd. 10 that "an alternative program" be provided suspended students after the initial five-day suspension period. In a memorandum addressed to all principals

---

**9.** Minn.St. § 127.30, subd. 2 provides:

A written notice containing the ground for suspension, a brief statement of the facts, a description of the testimony, a readmission plan, and a copy of sections 127.26 to 127.39, shall be personally served upon the pupil at or before the time the suspension is to take effect, and upon his parent or guardian by certified mail within 48 hours of the conference. In the event a pupil is suspended without an informal administrative conference on the grounds that the pupil will create an

immediate and substantial danger to persons or property around him, the written notice shall be served either personally or by certified mail upon the pupil and his parent or guardian within 48 hours of the suspension. Service by certified mail is complete upon mailing.

Under the Court's analysis, the school system would still be required under the Act to comply with the notice provisions when implementing an initial suspension.

and social workers, the defendant's procedures for instructional services to suspended students provides that homework is a permissible alternative program. This conclusion is also embodied in the defendant's "Demission Guidelines for Principals." The Act, of course, does not define what an alternative program entails, and arguably uses the term in completely different contexts.[10]

Plaintiff's expert, Dr. Bruce E. Balow, stated his opinion that homework did not amount to a sufficient alternative educational program for a student, such as K. J., who was suspended and provided homework during the latter two weeks she was out of school. In explaining his conclusions, Dr. Balow indicated that instruction takes place according to a defined curriculum within an educational environment and with substantial and regular feedback between teacher and student. Dr. Balow based his opinion on the premise that homework is not instructional or educational in nature, particularly where a student has difficulty in managing her own behavior. Dr. Balow reasoned that homework was not educational as it took place outside of an educational environment and because minimal or no daily feedback existed between teacher and student. Dr. William C. Phillips, Director of Curriculum and Student Services for the Minneapolis Public Schools, disagreed with Dr. Balow, when he stated his opinion that homework was a sufficient alternative program under the Act. As a justification for his opinion, Dr. Phillips pointed out that providing homework has the advantages of economy of time, contact by the student with his or her regular instructors, and the content of the assignment is prescribed by a person (the regular classroom teacher) aware of the child's needs and problems. Thus, for short term purposes, Dr. Phillips concluded that the time tested program of homework was not only a reasonable response to the Act but an adequate educational alternative program for suspended students. Dr. Arnold M. Rehmann, Director of Special Education for the defendant schools, agreed in substance with Dr. Phillips that homework was a sufficient alternative program, and defined an alternative program as something which varies from the regular educational process with regular students in a traditional classroom.

Plaintiff concentrates her arguments on the proposition that K. J.'s poor academic record and history of an unwillingness to work or complete assignments should have led the school system to prescribe a more supervised or elaborate educational program for K. J. while she was suspended. The position that plaintiff advocates can be summarized as requiring the school administration to provide an individually tailored program for each suspended student which includes instruction within an educational environment according to a defined curriculum and with a substantial degree of student-teacher interaction.

The decision as to the appropriateness of an alternative program for suspended students is not a mechanical one, but affords school officials a significant degree of discretion. This discretionary determination is essentially an instructional

---

10. For example, Minn.St. § 127.29, subd. 1 provides the school shall not "dismiss any pupil without attempting to provide alternative programs of education prior to dismissal proceedings . . . .." The provision attempts to define such alternative programs when it provides that the term may include "special tutoring, modification of the curriculum for the pupil, placement in a special class or assistance from other agencies."

In another vein, Minn.St. § 127.27, subd. 10 provides that school officials are under an obligation to prepare a "readmission plan" for every suspended student, and that each plan "shall include, where appropriate, a provision for alternative programs to be implemented upon readmission." Finally, Minn.St. § 127.27, subd. 10 again provides that in the consecutive suspension context, "an alternative program shall be implemented" after the five-day suspension period expires.

Thus, the phrase "alternative program" is used in the following contexts: prior to disciplinary action being taken, during the suspension period itself if the period exceeds five days, and upon readmission of the student after the disciplinary sanction expires. The term may not necessarily encompass the same things in all contexts.

decision. The determination of an adequate alternative program is not a disciplinary function. The involvement of the federal judiciary in the public school system serves at times important roles. *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). However, the federal courts are ill equipped to serve as arbiters of decisions by school officials which are primarily academic or instructional in content. *Board of Curators of the University of Missouri v. Horowitz*, 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978). In light of the historical control extended to school officials in making instructional decisions, and the discretionary nature of the determination as to the adequacy of an alternative program for suspended students, the Court has concluded that such a determination can be deemed unlawful only if it is established that school authorities acted or failed to act with a manifest abuse of discretion.

In this case, the Court has concluded that no such abuse of discretion has been established as to the adequacy of the alternative program provided to K. J. while she was suspended from Anwatin Middle School. The testimony of Dr. Phillips pointed out the advantages of homework as an alternative program, and while it per-haps would have been desirable to provide additional avenues of instruction, the Court cannot say with any assurance that school officials manifestly abused their discretion under the Pupil Fair Dismissal Act in making this peculiarly educational decision. However, in making this determination, the Court does not hold that under all possible circumstances supervised homework is a sufficient alternative program for students suspended from school. All the Court decides is that under these circumstances, the school administration's provision of supervised homework for K. J. while she was suspended was not a manifest abuse of discretion.

## II. FEDERAL AND STATE STATUTES AND REGULATIONS ON EDUCATION FOR HANDICAPPED CHILDREN

The plaintiff contends that school officials realized or should have realized that K. J., in light of her emotional difficulties, was a handicapped student as that term is defined in federal and state law.[11] Plaintiff postulates that as a handicapped or special education student, school officials were under an obligation to provide more formal hearing procedures in the suspension of K. J. As school officials had arranged for academic and psychological evaluation of K. J. prior to the time K. J. was suspended on May 16th, plaintiff also argues that the state special education rules are rele-

---

11. 20 U.S.C. § 1401(1) defines "handicapped" as follows:

> The term "handicapped children" means mentally retarded, hard of hearing, deaf, speech impaired, visually handicapped, seriously emotionally disturbed, orthopedically impaired, or other health impaired children, or children with specific learning disabilities, who by reason thereof require special education and related services.

State law, in Minn.St. § 120.03, defines handicapped children, and provides:

> Subdivision 1. Every child who is deaf, hard of hearing, blind, partially seeing, crippled or who has defective speech or who is otherwise physically impaired in body or limb so that he needs special instruction and services, but who is educable, as determined by the standards of the state board is a handicapped child.

> Subd. 2. Every child who is mentally retarded in such degree that he needs special instruction and services, but who is educable as determined by the standards of the state board, is a handicapped child.

> Subd. 3. Every child who by reason of an emotional disturbance, or a learning disability, or a special behavior problem needs special instruction and services, but who is educable, as determined by the standards of the state board is a handicapped child.

> Subd. 4. Every child who is mentally retarded in such degree that he requires special training and services and who is trainable as defined by standards of the state board is a trainable handicapped child.

Presumably, plaintiff's claim that K. J. is handicapped is because she is seriously emotionally disturbed.

vant, and that the school administration may not suspend students without providing a hearing with the formal procedures contemplated by the Minnesota special education regulations.

■ The Education of All Handicapped Children Act, 20 U.S.C. § 1401 et seq. was enacted to insure that all handicapped children are afforded a free appropriate public education which concentrates on the unique needs of the individual student. Also, the Act was designed to provide procedural protections to handicapped students and their parents in decision making areas which relate to the students' right to a free appropriate public education. *See generally Lora v. Board of Education of City of New York*, 456 F.Supp. 1211 (E.D.N.Y.1978). Thus, as the Act requires that states which receive federal assistance provide for elaborate due process hearing procedures whenever a change in a student's educational placement is proposed, requested or refused, the Act affords handicapped children and their parents extensive rights. Minnesota receives federal assistance within the meaning of the Act. The regulations of the Department of Education are embodied in 5 MCAR EDU 120–128, and these regulations provide extensive procedural protections for handicapped children and their parents.

■ The plaintiff urges that officials of the defendant school system possessed sufficient information to determine that K. J. was a handicapped student. Relying on the Minnesota regulations and *Mills v. Board of Education of District of Columbia*, 348 F.Supp. 866 (D.D.C.1972), plaintiff contends that children who are "thought by" the defendant to be handicapped are entitled to formal hearing procedures in the event of a suspension. Plaintiff's argument concerning K. J.'s status as a handicapped student is without merit. First of all, plaintiff completely failed to prove that school officials, prior to or at the time of K. J.'s suspension, had sufficient knowledge that K. J. was "seriously emotionally disturbed" or learning disabled to the extent that she was handicapped within the meaning of federal or state law. 20 U.S.C. § 1401(1); Minn.St.

§ 120.03. The formal educational assessment process is designed to help determine if a student is a handicapped child. Such an assessment had already been instituted at the time K. J. was suspended, but the results of her academic and psychological evaluation were not known at the time of her suspension.

■ More importantly, plaintiff's argument that the school system should have treated K. J. as a handicapped or special education student based on the suspicions of school officials is plainly inconsistent with and undermined by federal and state law governing the initial classification of children as handicapped students. The procedure by which a student is identified or classified as handicapped and thereby afforded special services formally begins with the assessment process. 5 MCAR EDU 120B.12. defines an assessment as "an individual evaluation, conducted in accordance with recognized professional standards and the provisions of EDU 124, of a person's performance and/or development for the purpose of determining the need for initiation or change in his or her educational program including special education services." State regulations provide that an assessment must be conducted when, because of a child's handicapping condition(s) or performance, the child "is thought by the school district to be in need of possible initiation or change in the student's educational placement . . . ." 5 MCAR EDU 124B.1.(a). Before any assessment can be accomplished, federal law and state regulations provide that written notice be given to parents which describes the nature of the assessment and the rights of the child and parent. 20 U.S.C. § 1415; 5 MCAR EDU 127B. Among these rights afforded parents and their children are the rights to object and be afforded a hearing on the issue of whether the school administration should propose or refuse to "initiate or change" the "identification, evaluation, or educational placement of the child or the provision of a free appropriate public education to the child . . . ." 20 U.S.C. § 1415(b)(1)(C). These hearing procedures

are clearly designed to minimize the risk of misclassification of children as handicapped or not handicapped, and to provide input of the parent and child in the identification or classification decision. *Lora v. Board of Education of the City of New York,* 456 F.Supp. 1211, 1227 (E.D.N.Y.1978). Thus, the schools are under a clear obligation to make the classification decisions through an exclusive formal process with the input of parent and child. The plaintiff's argument is simply incongruous, as to accept the plaintiff's assumption that school officials should have treated K. J. as a handicapped student based on the suspicions of the school officials would require the defendant to ignore and even violate federal and state law concerning the classification or identification decision of a student as handicapped and in need of special services.[12] To approve plaintiff's argument would thus defeat the purpose and promise of this important legislation and impose an impossible burden on school officials. As of May 16, 1977, K. J. had not been identified as a handicapped or special education student under the procedures required under federal or state law. For these reasons, the Court has determined that school officials had no obligation to treat K. J. as a handicapped or special education student on May 16, 1977, when the 15-day suspension was imposed. Consequently, it was unnecessary for the defendant school system to provide additional hearing procedures or a formal hearing with respect to the May 16th suspension of K. J.[13]

## III. CONSTITUTIONAL ARGUMENTS

In *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), high school students challenged the constitutionality of disciplinary suspensions which were imposed without any prior or subsequent hearing. The *Goss* Court articulated its holding as follows:

> due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story.

*Id.* at 581, 95 S.Ct. at 740. The *Goss* Court qualified its holding, however, when it stated:

> [w]e should also make it clear that we have addressed ourselves solely to the short suspension, not exceeding 10 days. Longer suspensions or expulsions for the remainder of the school term, or perma-

---

**12.** In light of the pervasive federal and state regulations with respect to the initial classification determination that a child is handicapped, language contained in *Mills v. Board of Education of District of Columbia,* 348 F.Supp. 866 (D.D.C.1972), which requires children to be treated as handicapped if "thought" to be handicapped, is clearly distinguishable. *See* 20 U.S.C. § 1415; Minn.St. § 120.17, subds. 3a & 3b.

**13.** Plaintiff, relying on 20 U.S.C. § 1415(e)(3) and 5 MCAR EDU 127B.13, argues that as K. J. was the subject of an ongoing educational assessment, the defendant could not change her educational placement during the pendency of the assessment, and as the suspension operated to alter her placement, the suspension was unlawful. This argument is deficient in a number of respects. Under the state regulations, a parental objection is necessary to preclude the school from changing the student's placement. There was no parental objection here. Nor had there been a judicial or administrative proceeding instituted under the Act, as the regulations require. Moreover, *Stuart v. Nappi,* 443 F.Supp. 1235 (D.Conn.1978), relied on by plaintiff, supports the opposite conclusion than that advocated by plaintiff. In *Stuart,* the court preliminarily enjoined a school defendant from attempting to *expel* a handicapped student who had formally objected to her educational program, as to do so would operate as a change in her educational placement during the pendency of her special education complaint in violation of 20 U.S.C. § 1415(e)(3). The court in *Stuart,* however, expressly found that the disciplinary measure of suspension, as opposed to an expulsion, would "permit the child to remain in his or her present placement . . . ." *Id.* at 1242. The position adopted in *Stuart* is consistent with the federal and state regulations on the issue. *See* Comment to 45 C.F.R. § 121a.513; 5 MCAR EDU 120A.7 (providing that the special education rules may apply in exclusion and expulsion proceedings, as opposed to suspensions). As the temporary disciplinary measure of suspension does not operate to change or alter a student's educational placement, plaintiff's argument is without merit.

nently, may require more formal procedures. Nor do we put aside the possibility that in unusual situations, although involving only a short suspension, something more than the rudimentary procedures will be required.

*Id.* at 584, 95 S.Ct. at 741. As noted, there is no controversy with respect to whether the required "informal give-and-take between student and disciplinarian" was followed by assistant principal King prior to the May 16th suspension of K. J. Plaintiff, however, contends that because *Goss* limited the scope of its holding to suspensions of 10 days or less, and as the suspension of K. J. amounted to 15 days, a more formal hearing is constitutionally required due to the increased severity of the deprivation. *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

 As the Court's decision has found that the suspension of K. J. was unlawfully accomplished under the Pupil Fair Dismissal Act, plaintiff is entitled to the relief she seeks, namely, a declaratory judgment that the suspension of K. J. was unlawful and expungement of any reference to the suspension from her school records. It was incumbent on the Court to consider plaintiff's pendent state law claims prior to a determination of any federal constitutional issues. *New York City Transit Authority v. Beazer,* 440 U.S. 568, 582, 99 S.Ct. 1355, 1364, 59 L.Ed.2d 587 (1979). The Court unquestionably has pendent jurisdiction over plaintiff's state law claims under the Pupil Fair Dismissal Act and the Minnesota regulations concerning handicapped students. *Hagans v. Lavine,* 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974). It is well settled that if a pendent claim, whether it be state or federal, disposes of the case and is sufficient to provide plaintiff with the relief sought, it is unnecessary to determine federal constitutional issues, and a federal court in these circumstances should refrain from constitutional adjudication. *Hutchinson v. Proxmire,* —— U.S. ——, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979); *New York City Transit Authority v. Beazer,* 440 U.S. 568, 582, 99 S.Ct. 1355, 1364, 59 L.Ed.2d 587 (1979); *FCC v. Pacifica Foundation,* 438

U.S. 726, 734, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978); *Hagans v. Lavine,* 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974). Consistent with this well established federal policy of avoiding the unnecessary adjudication of constitutional issues, the Court has determined that it is unnecessary to reach the constitutional arguments asserted by plaintiff, and leaves the resolution of this issue for a future controversy.

## IV. RELIEF

 Plaintiff is entitled to a declaratory judgment that the 15-day suspension imposed on K. J. was unlawful under state law. 28 U.S.C. § 2201. Moreover, plaintiff is entitled to have any reference to the May 16th suspension expunged from any school records of defendant containing such a reference. *Strickland v. Inlow,* 519 F.2d 744 (8th Cir. 1975). Plaintiff is entitled to equitable relief even if the grounds for her suspension were appropriate, and even if she would have been suspended in any event, as the procedures utilized by the defendant were deficient under the Pupil Fair Dismissal Act. *Piphus v. Carey,* 545 F.2d 30, 32 (7th Cir. 1976), *rev'd on other grounds,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). In the event that counsel for the parties cannot agree as to a reasonable amount of attorneys' fees to be awarded plaintiff's counsel pursuant to 42 U.S.C. § 1988, plaintiff's counsel may, within a reasonable time, apply to the Court for an order awarding attorneys' fees.

IT IS THEREFORE ADJUDGED that the May 16, 1977, disciplinary suspension of K. J. was unlawfully accomplished under the Minnesota Pupil Fair Dismissal Act and IT IS THEREFORE ORDERED that defendant delete and expunge any reference to said suspension from any records in its possession or under its control.