**Karen DODD, Karen Darnell, Faith Tompkins, Colleen Tompkins, Robin Longo, Plaintiffs,**

**v.**

**Larry RAMBIS, Principal of Brazil Senior High School, Dr. Charles Osborn, Superintendent of Clay Community Schools, James Ochs, John Bradshaw, Dr. Forrest Buell, James Beasley, Jane Pickett, Robert Hood and William Sisson, as members of the Board of Trustees of Clay Community Schools, Defendants.**

**No. TH 81–222–C.**

United States District Court,
S. D. Indiana,
Evansville Division.

Dec. 7, 1981.

---

**13.** *See* discussion at pp. 19–21, *supra.*

Mark W. Hunter, Brazil, Ind., Richard Zweig, Indiana Civil Liberties Union, Indianapolis, Ind., for plaintiffs.

Eric A. Frey of the Firm of Rosenfeld, Wolfe, Frey & Hunt, Terre Haute, Ind., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BROOKS, District Judge.

This matter comes before the Court on the plaintiffs' application for a preliminary injunction. Pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure, the Court, without objection by the parties, ordered that trial on the merits be advanced and consolidated with the preliminary injunction proceedings.

The Court, having heard the testimony and having examined the exhibits admitted into evidence and being duly advised in the premises, hereby enters the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. The plaintiffs to this suit are citizens and residents of the State of Indiana. At the time of the incident giving rise to this suit, the plaintiffs were students attending the Brazil Senior High School located in Brazil, Indiana. The plaintiffs brought this action pursuant to 42 U.S.C. § 1983 (1976) and its jurisdictional implementation, 28 U.S.C. § 1343 (1976).

2. The defendants in this action are: Larry Rambis, the principal of Brazil Senior High School; Dr. Charles Osborn, the Superintendent of the Clay Community Schools; and the Trustees of the Board of Education of the Clay Community Schools. The defendants to this action are all citizens and residents of the State of Indiana. The Brazil Senior High School exists within the jurisdiction of the defendants.

3. Mr. Larry Rambis began his employment as principal of Brazil Senior High School with the inception of the 1981–82 academic year on August 25, 1981. Prior to his appointment as principal of Brazil Senior High, Mr. Rambis was employed as a teacher for seventeen (17) years and as principal of Rosedale High School located in Rosedale, Indiana. At the time of the incident at issue in this suit, Mr. Rambis was in his third month as principal of Brazil Senior High School.

4. The physical location of Brazil Senior High School is such that approximately one hundred fifty (150) students from a neighboring junior high school pass along the

streets adjacent to Brazil Senior High School five (5) times each day passing between classes and going to and from the junior high school.

5. At some point in time during the 1981–82 academic year prior to the incident which gave rise to the present litigation, the students at Staunton High School staged a walkout from classes. Staunton High School is located in the general vicinity of Brazil, Indiana.

6. On Wednesday, September 30, 1981, fifty-four (54) students of Brazil Senior High School engaged in a student walkout in protest of the enforcement of certain school regulations dealing essentially with student smoking and student attendance.

7. The students who engaged in the walkout of September 30, 1981 gathered at a position directly in front of and across the street from Brazil Senior High School, well within the sight and hearing of the faculty and students in the classrooms located near the front of the school building.

8. Students in classrooms located near the front of the school building heard the voices of many of the students engaged in the walkout and action was necessitated on the part of the faculty to prevent some of the students from viewing the students engaged in the walkout and members of the press covering the event.

9. Shortly after the commencement of the walkout on Wednesday, September 30, 1981, Principal Rambis left the school building to address the students gathered outside the building. At that time, Principal Rambis sought to determine the spokesperson for the group. Three students came forward as spokespersons and a dialogue concerning school discipline ensued between the students and Principal Rambis. The discussion lasted one and one-half hours. During these discussions the number of students participating in the walkout increased.

10. Upon completion of the discussion between the students and Principal Rambis, Principal Rambis returned to the group of students participating in the walkout and informed these students that those who returned to classes at that time would be subject to a suspension of one day. Principal Rambis likewise stated that those students who remained out of classes would be subject to a suspension of three days.

11. During the afternoon and evening hours of September 30, 1981, Principal Rambis attempted to contact the parents of those students who participated in the walkout.

12. Those students who participated in the walkout on Wednesday, September 30, 1981 were subsequently suspended for periods ranging from one to three days.

13. Of the five students involved as plaintiffs in this action, only two participated in the walkout of Wednesday, September 30, 1981 and those students remained out of class for only a brief period of time.

14. On the evening of Wednesday, September 30, 1981, two of the five plaintiffs met at the residence of the remaining two plaintiffs to discuss the events of the day. This meeting culminated in the drafting of a leaflet which reads as follows:

Let's Support Our Rights
School Walkout: Friday
Time—9:00 a. m.
Place—Parking lot across from Eagles
Stay off school property
Meeting: For High School Students
6:30 p. m. parking lot behind Kentucky Fried Chicken. tonight
Support better Discipline Rules!!!

15. Following the drafting of the leaflet, one hundred and twenty-five (125) copies were produced for distribution to fellow students of Brazil Senior High School on Thursday, October 1, 1981.

16. On the morning of Thursday, October 1, 1981, less than twenty-four (24) hours after the walkout of Wednesday had ended, each of the five plaintiffs engaged in the distribution of the leaflets prepared the previous evening. The majority of the distribution occurred in the school halls prior to classes and during the passing periods between classes.

17. The fact that the leaflets were being distributed at Brazil Senior High School was brought to the attention of Principal Rambis by several teachers who had obtained copies of the leaflets and submitted them to Mr. Rambis.

18. Upon learning that the leaflets were being distributed, Principal Rambis and other faculty personnel sought to determine the source of the leaflets. This investigation led Principal Rambis to two of the five students involved as plaintiffs in this suit.

19. At the request of Mr. Rambis, the two plaintiffs initially discovered to have been responsible for the distribution of the leaflets appeared in the office of Principal Rambis on the afternoon of Thursday, October 1, 1981. Following a discussion of the incident in which Mr. Rambis quoted certain portions of the Brazil Senior High School Student Handbook, the plaintiffs were informed that they were suspended for three days pending a hearing on their conduct of passing out the leaflets.

20. Shortly after learning of the suspension of two of the plaintiffs, the remaining three plaintiffs and a fellow student not a party to this action, voluntarily reported to the principal's office and were likewise suspended for a period of three days pending a hearing on their involvement in passing out the leaflets.

21. Four students of Brazil Senior High School walked out of classes on Friday, October 2, 1981.

22. Each of the plaintiffs received written notices that they were suspended pending further proceedings to expel the plaintiffs for the remainder of the fall semester.

23. On the ninth day of October, 1981, pursuant to the statutory provisions of the Indiana Code, the plaintiffs were afforded a hearing before Mr. Kenneth L. Crabb, a hearing examiner appointed by Dr. Charles Osborn, the Superintendent of the Clay Community Schools. On the basis of his findings, the hearing examiner subsequently recommended that the plaintiffs be expelled for the remainder of the semester. The findings and recommendation of the hearing examiner were reviewed and accepted by the Superintendent, Dr. Charles Osborn.

24. The plaintiffs requested and were granted review of the decisions of the hearing examiner and the superintendent by the defendants, Trustees of the Board of Education of the Clay Community Schools. On October 19, 1981 the Trustees conducted inquiries into the leaflet incident with each individual plaintiff. The trustees received additional evidence from the plaintiffs and their parents during these inquiries.

25. At a meeting of the Board of Education of the Clay Community Schools, the Trustees met and affirmed the plaintiffs' expulsion from Brazil Senior High School for violation of the following rules:

a) Brazil Senior High School Student Handbook, Page 12, Section II, Paragraph 1.

b) Indiana Code Section 20–8.1–5–4(a) (Burns 1975 & Supp. 1981).

c) Indiana Code Section 20–8.1–5–4(*l*) (Burns 1975 & Supp. 1981).

The above specified rule of the Brazil Senior High School provides in pertinent part:

Any conduct which causes or which creates a reasonable likelihood that it will cause a disruption or material interference with any school function, activity, or purpose, or that interferes or a reasonable likelihood that it will interfere with the health, safety, or wellbeing or the rights of other students is prohibited.

The following is na (sic) enumeration of some of the main areas of conduct which may lead to disciplinary action, including possible expulsion for a period in excess of five (5) school days or for the balance of the school year.

. . . .

D. Interfering with school purposes or with the orderly operation of the school by using, threatening to use or counseling other persons to use violence, force, coercion, threats, intimidation, fear, or disruptive means.

26. During the pendency of the expulsion proceedings initiated against the plain-

tiffs to this action, procedures were discussed and subsequently implemented by the Superintendent, Dr. Osborn, and the Trustees of the Clay Community schools which would insure, if the plaintiffs so chose, that each of the plaintiffs would graduate at the proper time despite the expulsion. Such procedures included, among other things, the making of library facilities available to the plaintiffs and tutorials in certain required subjects.

27. At the beginning of the 1981–82 academic year of Brazil Senior High School, all students except the seniors were required to have a Brazil Senior High School Student Handbook made available by the school administration. The Brazil Senior High School Seniors were given the option of accepting or not accepting the student handbook. The public address system was frequently utilized to remind the student body of certain school regulations. In addition, notices of certain school rules, policies, and procedures were on occasion posted on school bulletin boards and distributed to the students of Brazil Senior High School.

28. On November 16, 1981, the plaintiffs brought this action pursuant to the Civil Rights Act, 42 U.S.C. § 1983 (1976), for alleged violation of rights secured to them by the First and Fourteenth Amendments to the United States Constitution.

## CONCLUSIONS OF LAW

1. The Court has personal jurisdiction over the parties to this action.

2. The Court has jurisdiction over the subject matter of this action. 28 U.S.C. § 1343 (1976).

■ 3. It is elementary that neither students nor members of the faculty "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). Indeed, our courts have long recognized the unique primacy of the First Amendment in the context of the American educational system. *See, e.g., Keyishian v. Board of Regents*, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967). School officials do not possess absolute authority over their students nor may they confine them to the expression of those sentiments that are only officially approved. What better place than a school to air controversial issues? Free expression teaches the student responsibility and at the same time demonstrates that the school itself is amenable to criticism. This is the essence of a healthy democracy. Freedom of expression demands breathing room. However, there are limits—no freedom is absolute. To allow such would violate the rights of others. In most instances it is the duty of the court to view the balance of interest—freedom of expression vs. individual rights—and to weigh the detrimental effect on each.

■ 4. However, the courts have also recognized and acknowledged the compelling nature of the state's interest in maintaining and cultivating its educational system. *Karp v. Becken*, 477 F.2d 171, 174 (9th Cir. 1973); *Burnside v. Byars*, 363 F.2d 744, 748 (5th Cir. 1966). The daily administration of public education is clearly the responsibility of state and local school officials, *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 507, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969); *Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968), and with that responsibility school officials possess the inherent authority to prescribe and control conduct in the public schools. *Epperson v. Arkansas*, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968).

5. The standard to be employed in the determination of controversies such as that currently before the Court was announced by the United States Supreme Court in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). As the Court cannot escape from the force of precedents, an analysis of *Tinker* is obviously required. *Tinker* involved an official proscription on the wearing of black arm bands on school premises by public school students in protest of the American involvement in Viet-

nam. The Supreme Court in *Tinker* held that a high school student is free to express his opinion,

> if he does so without "materially and substantially interfer[ing] with the requirements of appropriate discipline in the operation of the school" and without colliding with the rights of others . . . . But conduct by the student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech.

*Id.* at 513, 89 S.Ct. at 740. In addition, the *Tinker* Court indicated that a prohibition or regulation of student expression in school would not be constitutionally impermissible where school officials can demonstrate any facts which might reasonably lead school authorities to forecast substantial disruption of or material interference with school activities. *Id.* at 514, 89 S.Ct. at 740. The rule announced in *Tinker* is, of course, a flexible rule which must be applied in light of the special characteristics of the school environment and the totality of relevant facts in each case. *See Id.* at 506–07, 89 S.Ct. at 736; *Karp v. Becken*, 477 F.2d 171, 174 (9th Cir. 1973).

The development of First Amendment rights has been tortuous and much difficulty has been experienced in reconciling the results in individual cases. Because of the "fine line" between what is protected and what is not protected, the cases have been "fact sensitive". Therefore, it is impossible to predict or spell out with any degree of certainty whether any particular conduct falls within or without First Amendment protection.

■ 6. The conduct for which the five plaintiffs in this action were suspended and subsequently expelled was their actions on Thursday, October 1, 1981 of distributing leaflets to other students of Brazil Senior High School in protest to the severity with which certain of the school disciplinary rules were enforced by the school adminis-

tration. The leaflets were distributed by the plaintiffs in the school halls prior to classes and during the passing periods between classes and read as follows:

> Let's Support Our Rights
> School Walkout: Friday
> Time—9:00 a. m.
> Place—Parking lot across from Eagles
> Stay off school property
> Meeting: For High School Students
> 6:30 p. m. parking lot behind Kentucky Fried Chicken. tonight
> Support better Discipline Rules!!!

The evidence presented at the trial of this cause indicates that the suspension and subsequent expulsion of the plaintiffs was based on the action of the plaintiffs in distributing the leaflet to the other students of Brazil Senior High and the objectionable content of the leaflet in that it advocated a "walkout" from classes in violation of Page 12, Section II, Paragraph 1 of the Brazil Senior High School Student Handbook and Sections 20–8.1–5–4(a) to –4(1) of the Indiana Code. It is of no legal significance that the school authorities did not like what the students were saying, as the right to express a point of view is protected so long as it does not merge into impermissible conduct. This form of protection can never be outweighed by some other supposed interest of the state. The plaintiffs testified that the "School Walkout" language appearing in the leaflet was merely an "attention getter" for the time and place of the meeting to be held Thursday night. In response, the defendants argued that in light of the specifications contained in the leaflet of date, time, and location of the "School Walkout" and its further directive to "Stay off school property," the leaflet can only be construed as a direct advocation of a boycott of classes.

It cannot seriously be maintained that the actions of the plaintiffs in distributing the leaflets to the other students of Brazil Senior High School in protest to the manner in which certain of the school disciplinary rules were enforced and informing them of an organizational meeting to be held Thursday night did not fall within the protective

umbrella of the First Amendment. *Cf. Karp v. Becken*, 477 F.2d 171 (9th Cir. 1973) (student's production and distribution of signs on school premises in protest to school's refusal to renew teaching contract held protected by First Amendment). As such, the action of the defendant, currently under consideration, constituted an infringement of the plaintiffs' right to freedom of expression and the Court is left with the task of determining whether, consistent with the dictates of *Tinker*, the conduct of the plaintiffs could "reasonably have led school authorities to forecast substantial disruption of or material interference with school activities ... [or] intru[sion] in the school affairs or the lives of others." *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 514, 89 S.Ct. 733, 740, 21 L.Ed.2d 731 (1969); *Scoville v. Board of Education*, 425 F.2d 10, 13 (7th Cir.), *cert. denied*, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970).

7. In applying the forecast rule it should be noted that the conduct of an individual claiming an infringement of his First Amendment rights on school premises cannot be severed from the reality of the situation and viewed in a vacuum. *Karp v. Becken*, 477 F.2d 171, 175 (9th Cir. 1973); *Scoville v. Board of Education*, 425 F.2d 10, 14 (7th Cir.) *cert. denied*, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970). Rather, in addition to the action of the plaintiffs themselves, consideration must also be given to all other circumstances confronting the school authorities which might reasonably prompt a forecast of disruption. Thus, the fact that the evidence reveals that no serious or substantial disruption stemmed directly from the plaintiffs' distribution of the leaflets does not, of itself, invalidate the actions of the defendants in this case.

The defendants, of course, have the burden of bringing forth evidence justifying a reasonable forecast of material interference with the school's work, *Scoville v. Board of Education*, 425 F.2d 10, 13 (7th Cir.) *cert. denied*, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970), and the courts will not merely accept bare allegations on the part of the school authorities that such forecast existed. *Frasca v. Andrews*, 463 F.Supp. 1043 (E.D.N.Y.1979). The pleadings and the record currently before the Court reveal the following facts offered by the defendants as justifying a reasonable forecast of material disruption of school work:

(a) Approximately twenty-four (24) hours prior to the distribution of the leaflets by the plaintiffs, a walkout had occurred at Brazil Senior High School. The walkout resulted in the physical disruption of several classes and distracted those students remaining in class from the educational task at hand.

(b) The principal and assistant principal were both of the impression that throughout the day on Wednesday, there existed a general atmosphere of excitement evidenced by noisy and rowdy passing periods and by an increase in the number of students tardy to classes.

(c) The leaflets distributed by the plaintiffs, on their face, specified the date, time, and location of yet another walkout which, after an investigation, the principal determined would quite likely prompt another substantial disruption of the educational process of Brazil Senior High School.

In light of the walkout of fifty-four (54) students which occurred on Wednesday, September 30, 1981, the apprehension on the part of the school officials that another walkout of a much larger scale would occur on Friday, October 2, 1981 in response to the leaflets distributed by the plaintiffs can hardly be characterized as merely the "undifferentiated fear or apprehension of disturbance" referred to in *Tinker*. In *Tinker*, the circumstances surrounding the students' expression were unaccompanied by any disturbances or disorders on the school premises. *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 508, 514, 89 S.Ct. 733, 737, 740, 21 L.Ed.2d 731 (1969). The First Amendment does not require school officials to forestall action until disruption of the educational system

actually occurs. Indeed, this is the very essence of the forecast rule.

Considering all the facts and circumstances surrounding this case, the Court concludes that the forecast on the part of the defendant that the distribution of the leaflets by the plaintiffs would result in a substantial disruption of or material interference with the activities of the school unless appropriate action was taken was not unreasonable. As such, the Court concludes that the school officials involved as defendants to this suit could properly discipline the plaintiffs for their action in distributing the above described leaflets on Thursday, October 1, 1981.

8. The plaintiffs argue that even assuming that the circumstances of this case could reasonably have led the defendant school authorities to forecast substantial disruption of or material interference with school activities it was improper for the school authorities to impose discipline in the form of suspension or expulsion or to take any action against the plaintiffs other than ordering them to stop distributing the leaflets, and confiscating the leaflets. In support of this proposition the plaintiffs cite *Karp v. Becken*, 477 F.2d 171 (9th Cir. 1973). In *Karp*, the plaintiff brought an action pursuant to the Civil Rights Act, 42 U.S.C. § 1983, for alleged violation of his First Amendment rights against high school officials who suspended the plaintiff for handing out signs on school premises to other high school students in support of an English instructor whose contract the school had refused to renew. The court in *Karp* found that because there had been a disturbance previously, there existed sufficient evidence to support the school officials' forecast of a reasonable likelihood of substantial disruption of school activities. 477 F.2d at 176. Thus, the court concluded that the school officials were justified in taking the signs away from the plaintiff. The court, however, went on to state:

> The sign activity in this case constituted the exercise of pure speech rather than conduct. . . . As such, it comes within the protective umbrella of the First Amendment. We have already held that school officials may curtail the exercise of First Amendment rights when they can reasonably forecast material interference or substantial disruption. However, for discipline resulting from the use of pure speech to pass muster under the First Amendment, the school officials have the burden to show justification for their action. Here they have failed to do so. Absent justification, such as a violation of a statute or school rule, they cannot discipline a student for exercising those rights. The balancing necessary to enable school officials to maintain discipline and order allows curtailment but not necessarily punishment. Consequently, appellant could not be suspended for his activities with the signs.

477 F.2d at 176.

The Court notes that it does not read *Tinker* as requiring that a distinction be drawn between pure speech and other forms of expression protected by the First Amendment in passing upon the punishment imposed upon students in cases such as that currently before the Court. However, even accepting the plaintiffs' argument, it would appear that the "justification" for discipline as required by *Karp* is present in the instant case in the form of a school regulation. Brazil Senior High School Student Handbook, Page 12, Section II, Paragraph 1 (1981–1982). In any event, the Court is of the opinion that once a reasonable forecast of material interference with the school's work is made, school officials should be accorded a wide degree of discretion in determining the appropriate punishment to be imposed. This concept has been generally accepted by the courts. *See* Wright, *The Constitution on the Campus*, 22 Vand.L.Rev. 1027, 1081 (1969). Although the Court may not completely agree with the punishment imposed in this case, the punishment imposed on the plaintiffs appears to fall within the range of punishment authorized by statute. There is substantial evidence to indicate that the plaintiffs violated valid school rules, which are consistent with statutory law, and that the plaintiffs were afforded a hearing that was

procedurally fair and reasonable. Ind.Code § 20–8.1–5–11(f) (Burns Supp.1981). Clearly, the punishment levied on the plaintiffs was not so harsh or unreasonable as to render it arbitrary, capricious, or an abuse of discretion in contravention of their rights secured by the Fourteenth Amendment.

9. The plaintiffs alleged in their complaint that upon review of the leaflet incident by the Trustees of the Board of Education of the Clay Community Schools on October 19, 1981, they were deprived of their right to substantive due process in that the school trustees received additional evidence and did not act as impartial fact finders. The plaintiffs presented no evidence in support of their claim that the school trustees acted impartially and under the applicable provisions of the Indiana Code, the governing body is empowered to hear additional evidence when reviewing an expulsion decision. Ind.Code § 20–8.1–5–11(b) (Burns Supp.1981).

10. In reaching the foregoing conclusions, the Court concurs with the court in *Frasca v. Andrews*, 463 F.Supp. 1043 (E.D. N.Y.1979) when it stated:

> Since the disputes which arise in the day-to-day operations of our public schools cannot as a general rule be resolved by federal district judges, who necessarily must view them after the fact, from a remote point of view, and without direct responsibility for the immediate and practical consequences of the determinations, the rule has been wisely established that decisions of school officials will be sustained, even in a First Amendment context, when, on the facts before them at the time of the conduct which is challenged, there was a substantial and reasonable basis for the action taken.

*Id.* at 1052. However, although accepting the statement of the *Frasca* court, this Court is not unmindful that the pressures of the position of school administrators which prompt the grant of discretion also, at times, may harden school officials to even the most fundamental forms of justice and fair play. *See* Wright, *The Constitution on the Campus*, 22 Vand.L.Rev. 1027,

1086 (1969). At this point, of course, the courts will not fail to intervene. Short of this, however, the Court is of the opinion that a quiet discussion between mature students and a benevolent school administrator is unquestionably preferable to a formal adversary proceeding such as that currently before the Court. Many times a patient response rather than discipline and expulsion is the better remedy. It is a judgment call and for reasons already stated in this opinion the Court will not substitute its judgment for that of the school officials.

It is hopeful that this decision will not be interpreted so as to result in a "chilling effect" on students advocating constitutionally protected conduct. On the other hand, the Court does not intend that this ruling shall give to the school officials a license or invitation to prohibit conduct that is constitutionally protected. Rather, the Court is simply saying that under the facts in this case, the principal and school officials were proper in their actions and that the Court placed considerable significance to the fact that a walkout had occurred the day before. A variation in the facts as to time, place and manner could very well change the result.

11. Any conclusions of law deemed to be a finding of fact and vice-versa shall be so designated.