Janet BYSTROM, a minor, By and Through Robert and Helen BYSTROM, parents and natural guardians; Adam Collins, a minor, by and through Michael and Melinda Collins, his parents and natural guardians; and David Drangeid, a minor, by and through Gerald Drangeid, his father and natural guardian, Plaintiffs,

v.

FRIDLEY HIGH SCHOOL, Independent School District No. 14, a municipal corporation; Dr. Dennis Rens, Superintendent of Independent School District No. 14, in both his individual and representative capacity, and Donald Meyers, Principal of Fridley High School, in both his individual and representative capacity, Defendants.

No. 3–86–511.

United States District Court,
D. Minnesota,
Third Division.

June 30, 1987.

Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan by Stephen J. Foley, Minneapolis, Minn., for plaintiffs.

Felhaber, Larson, Fenlon and Vogt by Paul J. Zech, Minneapolis, Minn., for defendants.

## MEMORANDUM ORDER

ALSOP, Chief Judge.

This matter came before the court on May 8, 1987, upon defendants' motion for summary judgment. Viewing the record in the light most favorable to plaintiffs, the court makes the following statement of:

## UNDISPUTED FACTS

In January 1985 a group of students at Fridley High School, including one of the plaintiffs in this action, distributed on the high school premises an unofficial newspaper, entitled Tour de Farce, which they had written. The day after the students distributed this newspaper, officials of Fridley High School summoned the students to a conference and advised them that their distribution of Tour de Farce violated a published school district policy. This school district policy required prior approval by the school administration of all unofficial literature distributed on school premises. Tour de Farce is "unofficial literature" within the meaning of that policy. Plaintiffs were threatened with disciplinary action by the high school if any other distributions took place without complying with the school district policy.

On May 22, 1985, four students, including one plaintiff in this action, commenced an action in this court against Fridley High School, Independent School District No. 14, Dr. Dennis Rens, Superintendent of Independent School District No. 14, and Richard Stanton, then the principal of Fridley High School. The lawsuit challenged the school district's policy on distribution of unofficial literature on the grounds that this policy was an unconstitutional infringement on plaintiffs' first amendment rights and that the policy violated due process rights guaranteed by the fourteenth amendment.

On or about August 20, 1985, the school board adopted a revised school policy on distribution of unofficial literature. Plaintiffs then filed and served upon defendants a supplemental complaint, challenging the revised school policy as an unconstitutional exercise of state power in violation of the plaintiffs' first and fourteenth amendment rights. David Drangeid, another plaintiff in this action, was added as a plaintiff in this supplemental complaint.

Following another distribution of the students' newspaper on the sidewalk adjacent to the premises of Fridley High School, the school board adopted a second revised policy on distribution of unofficial literature. This revised policy threatened disciplinary action only against students who distribute material upon the premises of Fridley High School in contravention of the revised policy. On March 5, 1986, Honorable Robert G. Renner, Judge of this court, issued an order granting plaintiffs' motion for summary judgment in that action, and denying defendants' motion for summary judgment. Judge Renner declared that the policy restricting "distribution of unofficial written material on school premises" is a prior restraint which unconstitutionally infringes the first amendment rights of student publishers. *Bystrom v. Fridley High School, Independent School District No. 14*, Civ. No. 3–85–911 (D.Minn. March 5, 1986) [available on WESTLAW, 1986 WL 20833]. Defendants in that action appealed the court's decision to the United States Court of Appeals for the Eighth Circuit. The court of appeals heard argument on that appeal on October 17, 1986, and vacated the district court's order on June 25, 1987. *Bystrom v. Fridley High School*, 822 F.2d 747 (*Bystrom I*).[1]

On June 2, 1986, plaintiffs Janet Bystrom, Adam Collins, and David Drangeid, all students at Fridley High School, distributed a publication entitled Tour de Farce No. 4 in the cafeteria at Fridley High School. This distribution occurred at approximately 7:45 to 7:55 a.m., a time when the cafeteria at Fridley High School serves as an informal gathering place for students, and this distribution did not disturb any regularly scheduled school activity.

Tour de Farce No. 4 comprises an eight page collection of original writings and drawings and reproductions of material that first appeared in other publications. Some materials in the publication were plainly frivolous exercises in sophomoric humor with a strong bent toward the vul-

---

**1.** The court of appeals held that the disciplinary policy at issue in *Bystrom I* is not unconstitutional on its face, except for a guideline prohibiting expression which "invades the privacy of another person." At 755. The court noted that, "[t]his does not mean that every application of the policy will be valid, or that it would have been valid if applied to prohibit the particular newspaper produced by these plaintiffs." *Id.* Thus the court expressly left open the issues now before this court.

gar and profane. Others addressed more substantial issues, such as the school's policy prohibiting students from leaving the school premises during their lunch hour and the need for more stringent enforcement of rules prohibiting smoking in the school rest rooms. One article reported an incident of vandalism that had occurred at the home of a Fridley High School teacher several weeks earlier. Entitled "Trash & Slash '86," this article claimed, "many students attending Fridley would like to claim responsibility for this act, and I can't say that I blame them." The author then concluded, "I would like to say that we at Tour de Farce find this act pretty damn funny."

Throughout the morning of June 2, 1986, students at Fridley High School passed around the limited supply of Tour de Farce copies available. In circulating, reading, and reacting to this publication, some students at the school disrupted their classes to such a degree that their teachers found it necessary to interrupt their teaching to quell these disruptions. None of the plaintiff students, however, participated in these disruptions. In addition to the classroom disruptions, the teacher named in the "Trash & Slash" article left the school grounds altogether rather than face the students' reaction to the article.

Having reviewed the publication, school officials decided to suspend the plaintiff students' attendance at the school. In accordance with school policy, therefore, the officials summoned the students to the office of Dr. Brian Ingvalson, Assistant Principal of Fridley High School. Dr. Ingvalson met with each student individually, and informed each that he was contemplating suspending them for advocating violence against the homes of teachers. Although Dr. Ingvalson asked each student if he or she had any questions or comments concerning the proposed suspension, each of the students felt nothing could be said to change the administrators' minds. The students did assert their belief that suspension would be inappropriate. Each student was in fact suspended for the remaining three days of the school year.

On June 3, 1986, plaintiffs filed this action. In a three count complaint, plaintiffs allege defendants violated Section 1983 of Title 42, United States Code, by infringing the three suspended students' first amendment rights of freedom of press and speech, and the fourteenth amendment rights of due process, all under color of state law. Plaintiffs also allege defendants violated the Minnesota Pupil Fair Dismissal Act of 1974, Minn. Stat. § 127.26–.39 (1986). That same day, plaintiffs sought an order of this court restraining defendants from suspending the students and ordering their reinstatement. On June 4, 1986, the court denied this motion. Plaintiffs served the remainder of their three day suspension, made up their final exams over the summer, and progressed to the next grade the following autumn. Defendants now seek summary judgment as to all allegations by the plaintiffs.

## DISCUSSION

The Eighth Circuit Court of Appeals instructs that summary judgment is an appropriate remedy only if "the moving party has established his right to a judgment with such clarity as to leave no room for controversy and the non-moving party is not entitled to recover under any discernible circumstances." *Camfield Lines, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1364 (8th Cir.1983) (quoting *Butler v. MFA Life Insurance Co.*, 591 F.2d 448, 451 (8th Cir. 1979)). The Eighth Circuit further instructs that this court must give the non-moving party the benefit of all reasonable inferences to be drawn from the underlying facts. *Glass v. Allis Chalmers Corp.*, 789 F.2d 612, 613 (8th Cir.1986). Summary judgment, however, is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules of Civil Procedure as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1); *see Automotive Petroleum & Allied Indus. Employees v. Gelco Corp.*, 758 F.2d 1272, 1276 (8th Cir.1985).

The most salient aspect of this action is that it is a challenge to a disciplinary

decision by authorities responsible for the administration of a public school. As the Supreme Court has observed, the objectives of public education include the "inculcation of fundamental values necessary to the maintenance of a democratic political system." *Bethel School District No. 403 v. Fraser*, 478 U.S. 675, ——, 106 S.Ct. 3159, 3164, 92 L.Ed.2d 549 (1986) (quoting *Ambach v. Norwick*, 441 U.S. 68, 76–77, 99 S.Ct. 1589, 1594–95, 60 L.Ed.2d 49 (1979)). The importance of this objective gives rise to a compelling interest on the part of the state in maintaining and cultivating its educational system. *Karp v. Becken*, 477 F.2d 171, 174 (9th Cir.1973); *Dodd v. Rambis*, 535 F.Supp. 23, 27 (S.D.Ind.1981). Thus state and local officials possess the inherent authority to prescribe and control conduct in the public schools. *Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968). In recognition of this inherent authority, and of the cumbersome nature of judicial review by a federal court, "the rule has been wisely established that decisions of school officials will be sustained, even in a first amendment context, when, on the facts before them at the time of the conduct which is challenged, there was a substantial and reasonable basis for the action taken." *Dodd*, 535 F.Supp. at 31 (quoting *Frasca v. Andrews*, 463 F.Supp. 1043 (E.D.N.Y.1979)).

▮ The federal courts' deference to school officials is not without limits. The authority of school officials is that of the state, and not of the parents.[2] Therefore, school officials are subject to the commands of the first amendment, *see Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), and the due process clause of the fourteenth amendment, *see Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). *New Jersey v. T.L.O.*, 469 U.S. 325, 336, 105 S.Ct. 733,

739, 83 L.Ed.2d 720 (1985). With these principles in mind, then, the court will address each of plaintiffs' claims in turn.

### I. *Plaintiffs' First Amendment Claim.*

Tour de Farce is a public forum protected by the first amendment's assurances of freedom of speech and of the press. *Tinker*, 393 U.S. 503, 506, 89 S.Ct. 733, 736; *Kuhlmeier v. Hazelwood School District*, 795 F.2d 1368, 1371–74 (8th Cir.1986), *cert. granted*, —— U.S. ——, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987). Even school officials who enjoy judicial deference to their disciplinary decisions based upon the courts' recognition that such deference best enables the officials to proceed with the business of inculcating in students the nation's "fundamental values" must not overlook the prominent place freedom of expression holds among these values. As Mr. Justice Harlan wrote for the Supreme Court:

The constitutional right of free expression is powerful medicine in a society as diverse and populous as ours. It is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each us, in the hope that the use of such freedom will ultimately produce a capable citizenry and more perfect polity and in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests. To many, the immediate consequence of this freedom may often appear to be only verbal tumult, discord and even offensive utterance. These are, however, within established limits, in truth necessary side effects of the broader enduring values which the process of open debate permits us to achieve. That the air may at times seem filled with verbal cacophony is, in

2. Defendants draw the court's attention to the *Fraser* majority's statement that prior Supreme Court decisions recognize "the obvious concern of school officials acting *in loco parentis* to protect children from exposure to sexually explicit, indecent, or lewd speech." *Fraser*, 106 S.Ct. at 3165. This language, however, must be viewed in its proper context. Although school officials' *concern* for the protection of children

derives from their capacity *in loco parentis,* their *authority* to protect the children in their schools derives from the state, and is constrained by the Bill of Rights. *See Board of Education v. Pico*, 457 U.S. 853, 864, 102 S.Ct. 2799, 2806, 73 L.Ed.2d 435 (1982); *West Virginia Board of Education v. Barnette*, 319 U.S. 624, 637, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943).

this sense, not a sign of weakness but of strength. We cannot lose sight of the fact that, in what otherwise might seem a trifling and annoying instance of individual distasteful abuse of a privilege, these fundamental societal values are truly implicated.

*Cohen v. California*, 403 U.S. 15, 24–25, 91 S.Ct. 1780, 1787–88, 29 L.Ed.2d 284 (1971) (citations omitted).

First amendment protections, however, are not absolute. Instead, they must be "applied in the light of the special circumstances of the school environment." *Fraser*, 106 S.Ct. at 3164; *Tinker*, 393 U.S. at 506, 89 S.Ct. at 736; *Kuhlmeier*, 795 F.2d at 1371. Thus school officials may regulate expression of opinions which "materially and substantially interfere[s] with the requirements of appropriate discipline in the operation of the school" or collides with the rights of others. *Tinker*, 393 U.S. at 513, 89 S.Ct. at 740 (quoting *Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir.1966)). Similarly, it is "perfectly appropriate" to impose sanctions "to make the point to pupils that vulgar speech and lewd conduct is wholly inconsistent with the 'fundamental values' of public school education." *Fraser*, 106 S.Ct. at 3166.

■ Fridley school officials justify their decision to suspend plaintiffs on three grounds: that distribution of Tour de Farce materially disrupted school activities, that the publication contains vulgar and indecent language, and that the publication advocated violence against teachers.[3]

### A. Material Disruption.

■ This case involves only pure speech; there is no claim that the plaintiff students' conduct in distributing the Tour de Farce papers, which occurred in the school lunch room at a time of day when that place was committed to use as a public commons, disrupted regular school activities. Any disruptive conduct that occurred was that of students other than plaintiffs who disrupted their classes by passing around,

reading, and reacting to plaintiffs' paper. *See Cohen v. California*, 403 U.S. 15, 18, 91 S.Ct. 1780, 1784, 29 L.Ed.2d 284 (1971). Plaintiffs evinced no intent even to advocate disruption of school activities. Nevertheless, school officials may impose reasonable punishment even when pure speech by students leads to a substantial disruption of school activities. *Dodd v. Rambis*, 535 F.Supp. 23, 30 (S.D.Ind.1981); *but see Karp v. Becken*, 477 F.2d 171, 176 (9th Cir.1973) (school officials prohibited from suspending student for handing out signs to be used in protests, despite likelihood of disruption).

■ Plaintiffs contend a genuine issue of material fact exists as to whether or not a disruption of school activities resulted from distribution of Tour de Farce No. 4. The parties engage in a battle of affidavits with respect to this issue. Defendants offer affidavits of five teachers attesting that disruption did occur as a result of the publication. Plaintiffs offer the affidavit of one teacher and the three plaintiff students who assert that no such disturbance occurred. Fridley High School is a large school, and none of plaintiffs' affiants claim personal knowledge of all events that occurred at Fridley High School on June 2, 1986. Plaintiffs' affidavits, which are acceptable only insofar as they relate the affiants' personal knowledge, do not raise a genuine issue of material fact as to the veracity of the affidavits submitted by defendants or the credibility of defendants' affiants. Therefore, plaintiffs' affidavits fail to negate the testimony of defendants' affiants that material disruption of the Fridley High School activities occurred as a result of the publication of Tour de Farce No. 4. Thus there appears to be no genuine issue with respect to this issue. The court concludes as a matter of law that the school officials could, consistent with the first amendment, punish that disruption. *See Fraser*, 106 S.Ct. at 3168 (Brennan, J., concurring).

---

3. It is not essential for first amendment purposes that school officials contemporaneously delineate the grounds upon which they base a decision to restrict expression. Whether or not speech is protected depends in no way upon the ability of a school official to articulate the correct constitutional analysis at the time he takes a disciplinary action. Needless to say, however, this analysis does not apply in the due process context.

## B. *Indecent, Vulgar Language.*

As the Supreme Court made clear in *Fraser,* school officials may punish sexually explicit, indecent, or lewd speech "to make the point to pupils that such speech is wholly inconsistent with the 'fundamental values' of public education." 106 S.Ct. at 3166. *See Bystrom I,* at 753. Plainly, Tour de Farce contains language that is more sexually explicit, indecent, and lewd than Fraser's strictly metaphorical speech. Thus the defendants acted within their discretion in punishing the plaintiff students on this basis.

## C. *Advocacy of Violence.*

The Supreme Court has not yet addressed the question when school officials can punish students for advocating violence or other unlawful conduct. The language of the "Trash & Slash" article falls far short of the standards by which adults could be punished for advocating violence. The constitutional guarantees of free speech and free press do not permit a state to forbid or proscribe advocacy of the use of force or law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action. *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 928, 102 S.Ct. 3409, 3433, 73 L.Ed.2d 1215 (quoting *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969)), *reh'g denied,* 459 U.S. 898, 103 S.Ct. 199, 74 L.Ed.2d 160 (1982); *see Hess v. Indiana,* 414 U.S. 105, 108, 94 S.Ct. 326, 328, 38 L.Ed.2d 303 (1973). No such direction or likelihood appears in the plaintiff students' publication.

The language at issue in *Fraser,* however, also fell far short of the sexually explicit speech regulated in *Ginsberg v. New York,* 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968), and the indecent speech banned in *FCC v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978). *See Fraser,* 106 S.Ct. 3168 n. 2 (Brennan, J. concurring). The Supreme Court nevertheless deferred to the school authorities' decision that maintaining order and discipline and proper inculcation of traditional social values required discipline of the student involved. *Id.* at 3166. There-

fore, this court must conclude that the Supreme court would defer to the school authorities in the same manner with respect to their decision to discipline the plaintiff students for advocating violence against their teachers.

Accordingly, the court holds that the defendants did not violate plaintiffs' first amendment rights by suspending them for publishing Tour de Farce No. 4.

## II. *Plaintiffs' Due Process Claims.*

■ Having chosen to establish and maintain a public school system, and having extended the right of attendance to people in the plaintiff students' class generally, Minnesota may not withdraw that right on grounds of misconduct, absent fundamentally fair procedures to determine whether the misconduct has occurred. *Goss v. Lopez,* 419 U.S. 565, 574, 95 S.Ct. 729, 736, 42 L.Ed.2d 725 (1975). The state is constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the due process clause which may not be taken away for misconduct without adherence to the minimum procedures required by that clause. *Id.* The due process clause also forbids arbitrary deprivations of liberty. "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him" the minimal requirements of the clause must be satisfied. *Id.* (quoting *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971)); *see Board of Regents v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972).

Due process requires, in connection with a suspension of ten days or less, that the student be given oral or written notice of charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story. *Goss,* 419 U.S. at 581, 95 S.Ct. at 739. The clause requires at least these rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion from school. *Id.* at 574, 95 S.Ct. at 736.

Plaintiffs object to the procedure employed in suspending them on the theory that the meeting in Dr. Ingvalson's office afforded them an inadequate notice and opportunity to be heard. Plaintiffs also contend that Ingvalson, in telling plaintiffs he proposed to suspend them, offered only a pretextual basis for their suspension.

■ There exists no genuine issue as to the substance of the conversations that occurred in Dr. Ingvalson's office. Ingvalson informed each student that he was contemplating suspending the student for advocating violence against teachers. The students, believing suspension was inevitable, made no substantive response to this charge, except to state they felt punishment was inappropriate.

The Supreme Court's decision in *Goss* guarantees only an "informal give-and-take between student and disciplinarian." *Mrs. A.J. v. Special School District No. 1*, 478 F.Supp. 418, 433 (D.Minn.1979). A three day suspension from school does not rise to the level of a penal sanction calling for the full panoply of procedural due process protections applicable to a criminal prosecution. *Fraser*, 106 S.Ct. at 3166; *cf. Goss*, 419 U.S. 565, 95 S.Ct. 729. More generally, due process principles have never assured a successful defense. Instead, a student facing a suspension of less than ten days is entitled only to state his or her view of the events precipitating the suspension for the purpose of avoiding "unfair or mistaken findings of misconduct and arbitrary exclusion from school." *Goss*, 419 U.S. at 581, 95 S.Ct. at 740. Plaintiffs received this opportunity.

Dr. Ingvalson and the defendants have maintained from June 2, 1986, forward that their purpose in suspending the plaintiff students was to punish them for advocating violence against teachers. Because defendants have presented evidence, in the form of Dr. Ingvalson's deposition, to support this position, the onus shifts to plaintiffs to produce some factual basis from which an inference could be drawn that defendants' position is a pretext. *See Celo-*

*tex v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). In this court's view, the mere existence of the prior controversy over the Tour de Farce publication, including the prior litigation, is insufficient to support an inference that school officials, who properly enjoy the considerable judicial deference discussed above, acted out of peevish spite rather than a genuine concern for the peace of the school and the security of its teachers. Because plaintiffs offer only evidence of this prior controversy to support their position, they have failed to demonstrate the existence of a genuine issue of material fact with respect to the basis for the plaintiffs' suspension.

Even if this court were to assume plaintiffs are correct that advocacy of violence was a mere pretext for defendants' decision to suspend them from school, defendants would not have violated plaintiffs' due process rights. Although a student does not receive notice of the charges against him, a court will not find an absence of procedural due process if the substantive evidence against the student was so overwhelming that the school officials would again impose the same penalty and a second hearing would accomplish no amelioration of the prior deprivation. *McClain v. LaFayette County Board of Education*, 687 F.2d 121, 122 (5th Cir.1982). In this matter, the students involved acknowledged their responsibility for the publication and were given an opportunity to state their views with respect to the school administration's proposal to suspend them. In the context of a brief suspension from school, students are entitled only to rudimentary procedural safeguards. *Goss*, 419 U.S. at 581, 95 S.Ct. at 739. The meeting with Dr. Ingvalson satisfied this requirement, whether or not plaintiffs were fully apprised of the precise basis of the administration's decision. A legitimate basis existed for the suspension, even if an illegitimate basis co-existed with the legitimate, and the students had an opportunity to respond to the legitimate basis, and the illegitimate if they perceived it at the time.[4]

4. The court wishes to emphasize that the foregoing discussion is strictly hypothetical; indeed, the court perceives no factual basis from which

an inference of illegitimate purpose could be drawn.

Thus, even if defendants failed to inform the students of the precise grounds for their suspension, the students nevertheless received the rudimentary process due them under the circumstances.[5]

A note of caution is necessary concerning the foregoing discussion. Although the court holds that the plaintiff students received all the process due them under the circumstances of this case, regardless of whether the school officials acted out of a genuine concern for the safety of teachers or out of frustration with the students, school officials should not read this holding as a license to deceive. On the contrary, deliberate deception in a disciplinary action could comprise a serious deprivation of due process in another case.

### III. *Minnesota Pupil Fair Dismissal Act of 1974.*

■ In 1974 the state of Minnesota enacted the Pupil Fair Dismissal Act. Minn. Stat. § 127.26–.39 (1986). This Act governs the permissible grounds and procedures for dismissal of a student from a public school. The term "dismissal" means the denial of the appropriate educational program to any pupil, including exclusion, expulsion, and suspension. Minn.Stat. § 127.27, subd. 2. The term "suspension" means an action taken by the school administration, under rules promulgated by the school board, prohibiting a pupil from attending school for a period of no more than five days. *Id.* at

subd. 10. The punishment imposed upon the plaintiff students in this matter fell within this definition.

The act sets forth its policy as follows: "No public school shall deny due process or equal protection of the law to any public school pupil involved in a dismissal proceeding which may result in suspension, exclusion, or expulsion." Minn.Stat. § 127.28. In view of this legislative purpose, and the Act's structure and substance, it is apparent that the Minnesota legislature sought to codify due process and equal protection standards applicable to dismissal of students from public schools into statutory law. As discussed above, the court concludes that defendants satisfied constitutional standards in suspending the plaintiff students. To the extent defendants failed to observe the technical requirements of the Act in a manner that does not rise to the level of a constitutional violation,[6] this deprivation must be viewed as *de minimus.*[7] Therefore, the court finds no violation of the Minnesota Pupil Fair Dismissal Act of 1974.

### CONCLUSION

This case has presented all involved with difficult questions of principle. The defense of constitutional freedoms depends upon the courage of citizens to challenge authority when it impinges on those freedoms. At the same, seeking constitutional protection for frivolous or even malicious

**5.** In *Wood v. Strickland,* 420 U.S. 308, 320, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975), the Supreme Court held that a qualified good-faith immunity from liability for damages under 42 U.S.C. § 1983 extends to school board members. Because the court concludes no actionable deprivation occurred in this instance, it need not reach the issue of the defendants' qualified immunity.

**6.** Minn.Stat. § 127.30, subd. 2 requires that written notice shall be personally served upon the pupil at or before the time the suspension is to take effect. This does not appear to have been done in this case. Such written notice, however, was mailed to the students' parents on the afternoon of their suspension.

**7.** This court's holding in *Mrs. A.J. v. Special District No. 1,* 478 F.Supp. 418 (D.Minn.1979) (MacLaughlin, J.), is not to the contrary. In *Mrs. A.J.,* the court held that the Pupil Fair Dismissal Act requires that a pupil suspended

for more than five days must receive an informal administrative conference prior to the beginning of each five day period of suspension. *Id.* at 426. Because school officials afforded plaintiff only one hearing in the course of her fifteen-day suspension, the school officials violated the Pupil Fair Dismissal Act. *Id.*

In effect, the defendants in *Mrs. A.J.* improperly imposed a ten day suspension without an informal administrative conference upon the pupil. This substantial violation of the Pupil Fair Dismissal Act is a far cry from Dr. Ingvalson's failure to provide the plaintiff students written notice of the grounds and terms of their suspension prior to its commencement. Indeed, although the court in *Mrs. A.J.,* did not reach the plaintiff's constitutional claims, the defendants' conduct there would appear to have raised serious due process concerns. *See Goss,* 419 U.S. 565, 95 S.Ct. 729.

conduct threatens the dilution of those same freedoms. No bright line divides these two circumstances in many cases, and this is one of those cases. Plaintiffs' lack of success in this action does not illuminate this dilemma; rather, in this matter the dilemma's resolution is best left to the plaintiffs' consciences.

Based upon the foregoing, the submissions and arguments of the parties, and the record as presently constituted,

IT IS ORDERED That defendants' motion for summary judgment be and the same hereby is granted and plaintiffs' action is dismissed with prejudice.

IT IS FURTHER ORDERED That the Clerk enter judgment as follows:

IT IS ORDERED, ADJUDGED, AND DECREED That plaintiffs' action be and the same hereby is dismissed with prejudice.